## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CARL KING AND** | § | |
| **LATANYA WALKER-KING** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 5:16-CV-1201-XR** |
| | § | |
| **VHS SAN ANTONIO PARTNERS, LLC** | § | |
| **D/B/A MISSION TRAIL BAPTIST** | § | |
| **HOSPITAL,** | § | |
| **VIKRAM DURAIRAJ, M.D., AND** | § | |
| **LONNY RAMEY, PA** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME **CARL KING** and **LATANYA WALKER-KING**, (hereinafter sometimes referred to as Plaintiffs), complaining of **VHS SAN ANTONIO PARTNERS, LLC d/b/a/ MISSION TRAIL BAPTIST HOSPITAL** (hereinafter sometimes referred to as **MISSION TRAIL BAPTIST HOSPITAL), VIKRAM DURAIRAJ, M.D.** (hereinafter sometimes referred to as **DURAIRAJ**), and **LONNY RAMEY, PA,** (hereinafter sometimes referred to as **RAMEY)** and for cause of action would show this Court as follows:

### I.     DISCOVERY CONTROL PLAN

1.      Discovery in this case is being conducted pursuant to the Court's Scheduling Order of February 22, 2017.

### II. PARTIES

2.      Plaintiff Carl King (hereafter "King") is an individual who resides in San Antonio, Bexar County, Texas.

**PLAINTIFFS' FIRST AMENDED COMPLAINT**                                    **Page 1**

3.      Plaintiff Latanya Walker-King is an individual who resides in San Antonio, Bexar County, Texas and is the legal wife of Carl King.

4.      Defendant VHS San Antonio Partners, LLC d/b/a/ Mission Trail Baptist Hospital (hereafter "MTBH") is a Texas corporation doing business in and having its principal office in San Antonio, Bexar County, Texas which has been served with process.

5.      Defendant Vikram Durairaj, M.D. (hereafter "Durairaj") is an individual doing business in the State of Texas who has been served with process.

6.      Defendant Lonny Ramey, P.A. is an individual doing business in the State of Texas who has been served with process.

### III. VENUE AND JURISDICTION

7.      MTBH is a hospital which has a hospital emergency department within the meaning of Title 42 U.S.C.A. § 1395dd(a), (c), and (d).

8.      MTBH violated Title 42 U.S.C.A. § 1395dd(a), and (c) as set forth below including the averments set forth under the "Statement of the Claim" and "Cause of Action and Damages":

(A)     On July 20, 2015, on two separate and distinct emergency department admissions, King presented to the MTBH emergency department requesting examination and treatment of his medical condition; on both occasions, MTBH failed to provide King with appropriate medical screening examinations within the capability of its emergency department to determine whether or not an emergency medical condition existed. MTBH did not have requisite policies and/or protocols regarding medical screening examinations and/or on both visits MTBH did not follow its screening procedures in that it failed to perform focused physical examinations on King. Further, King was not given the same medical screening examinations as MTBH provided to patients with the same or similar symptoms and signs and/or medical condition.  Thus, MTBH

treated King disparately from other patients with the same or similar symptoms and signs and/or medical condition as those of King.

(B)     On July 20, 2015, King, while a patient of MTBH's emergency department the first time, had an emergency medical condition that was not stabilized; and in spite of his unstabilized emergency medical condition, MTBH discharged King from its emergency department.  Further, at the time King was discharged, MTBH's emergency department, through its staff members and Durairaj, had actual knowledge of one or more of King's emergency medical conditions.

(C)     On July 20, 2015, during the second MTBH emergency department visit by King, the screening that King received by MTBH was so delayed – five hours - and/or paltry as to amount to no screening at all.  *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641 – Dist.; *Marrero v. Hospital Hermanos Melendez*, 253 F.Supp.2d 179, 194 (D.P.R. 2003); *Brooks*, 996 F.2d 708, 709, 71314 (4th Cir.1993) *Scruggs v. Danville Regional Medical Center of Virginia, L.L.C.,* No. 0800005, 2008 WL 4168645, 34, 2008 U.S. Dist. LEXIS 68630, 1012, (W.D.Va. Sept. 5, 2008).

9.     As a direct result of MTBH's violations of Title 42 U.S.C.A. § 1395dd(a) and (c), King suffered severe personal injury, entitling Plaintiffs to damages pursuant to Title 42 U.S.C.A. § 1395dd(d)(2)(A).

10.     Because this action arises under Title 42 U.S.C.A. § 1395dd ("EMTALA"), this court has original jurisdiction pursuant to Title 28 U.S.C.A. § 1331.  This case was removed from District Court, 166th Judicial District, Bexar County Texas pursuant to 28 U.S.C. §1446(a).  Venue is proper in this District Court under 28 U&.S.C § 1441(a) because the state court where the suit had been pending is located in the Western District of Texas.  A substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas.  As such, venue is proper in the Western District of Texas.  *See* 28 U.S.C. § 1391(a)(2).

11.     The court has pendent jurisdiction over Plaintiffs' remaining causes of action against Defendants MTBH, Durairaj, and Ramey under Texas law inasmuch as such state law causes of action are derived from a common nucleus of operative facts as Plaintiffs' causes of action under Title 42 U.S.C.A. § 1395dd.  *See, e.g., Feigler v. Tidex, Inc.,*826 F.2d 1435, 1439-40 (5th Cir. 1987).

12.     The amount of the Plaintiffs' damages is substantial and well in excess of the jurisdictional minimums of this Court. Many elements of damage, including pain, suffering and mental anguish in the past and future, past and future physical impairment, and future lost earning capacity, cannot be determined with mathematical precision. Furthermore, the determination of many of these elements of damage is peculiarly within the province of the jury. Plaintiffs also seek judgment for all other relief to which Plaintiffs are entitled. Plaintiffs reserve the right to file an amended pleading on this issue should subsequent evidence show this figure to be either too high or too low.

## IV. NOTICE

13.     Notice of the claims in this lawsuit was given to Defendants in the form required by Civil Practice & Remedies Code §74.051.

## V. CONDITIONS PRECEDENT

14.      All conditions precedent necessary to maintain these causes of action have been performed or have occurred.

## VI. STATEMENT OF THE CLAIM

15.     **Onset of problem**.  Wednesday, July 15, 2015, King, 51, began having right-sided neck pain absent known trauma, injury or other inciting event.

**PLAINTIFFS' FIRST AMENDED COMPLAINT**                                                                                 **Page 4**

16.     **1st Emergency Department admission**.  Early Thursday morning, July 16, 2015, when his neck pain had not gone away, King, presented via car to Methodist Hospital, San Antonio, emergency department complaining of his persistent right-sided neck pain.  The pain was severe; burning; aggravated by moving, lying on his right side and sitting; and radiated to his upper back.  Nothing relieved his pain. He also complained of difficulty swallowing since the previous day.  He neither complained of nor was found on examination to have sensory or motor deficits. On examination, he had right lower cervical paraspinal tenderness to palpation with muscle spasm that radiated to his trapezius and rhomboid muscles (neck and upper back muscles). He was on no medications and did not smoke tobacco.   He was diagnosed with cervical radiculopathy/brachial neuritis, treated with Norco 5/325 1 tablet p.o., Valium 5 mg tablet p.o., Prednisone 60 mg p.o., and Toradol 60 mg IM with some improvement in his pain, recommended to see his primary care physician (PCP), and sent home.

17.     **2nd Emergency Department admission.**   Late Friday night, July 17, 2015, and continuing on in to the early morning hours of Saturday, July 18, 2015, King presented to and was seen at Northeast Methodist Hospital, San Antonio emergency department complaining of persistent severe neck pain radiating to his right shoulder unrelieved by Valium, Ibuprofen, Tramadol and Prednisone received at Methodist Hospital emergency department.   He also complained of numbness of both arms.   On examination, King reportedly had right neck tenderness to palpation but no motor or sensory deficits.  Shoulder x-ray reportedly showed no fracture or dislocation.  Again, Toradol IM was given.  King was diagnosed with neck muscle spasms (torticollis, wryneck), prescribed Flexeril 10 mg #15 tablets, instructed regarding warm compress to his neck, recommended to see his PCP in 2 days, and sent home.

18.   **3rd Emergency Department admission (1st MTBH admission).**  Monday morning, July 20, 2015, at around 8:47 a.m., San Antonio Fire Department EMS (SAFD/EMS) was called regarding King.  The nature of the call was "Stroke/CVA".  SAFD/EMS responded and transported King on a stretcher to MTBH where he arrived at around 9:46 a.m. The MTBH emergency department record begins with a face sheet stating: "not employed" and "no ins[urance]".

19.   At all relevant times, including the **1st and 2nd MTBH Emergency Department admissions,** MTBH is and was a participating hospital that had entered into a provider agreement to be eligible for Medicare and Medicaid reimbursement. 42 U.S.C. § 1395dd(e)(2).

20.   At all relevant times, including the **1st and 2nd MTBH Emergency Department admissions,** King requested an examination and treatment for his medical condition. U.S.C. §1395dd(a).

21.   At all relevant times, including the **1st and 2nd MTBH Emergency Department admissions,** EMTALA required MTBH to provide King "an appropriate medical screening examination within the capacity of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exist[ed]." 42 U.S.C. §1395dd(a)(Parenthetical in original).[1]

22.   EMTALA does not define the phrase "appropriate medical screening examination" beyond placing it in the context of the remaining words of section 1395dd(a)—"within the

---

[1] Subsection €(1) of 42 U.S.C. § 1395dd defines the term "emergency medical condition" in relevant part as follows: [A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
(i)       placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
(ii)      serious impairment to bodily functions, or
(iii)     serious dysfunction of any bodily organ or part[.]

capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, ***to determine whether or not an emergency medical condition…exists.***" 42 U.S.C. §1395dd(a) (Emphasis added); *see Baber v. Hospital Corp. of Am.,* 977 F.2d 872, 879 (4th Cir. 1992). However, courts construing EMTALA have identified at least two criteria by which the appropriateness of a medical screening examination under EMTALA is judged:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it **[1]** provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients ***and* [2]** provides that level of screening uniformly to ***all*** those who present substantially similar complaints.

*Cruz-Queipo v. Hospital Espanol Auxilio Mutuo de Puerto Rico,* 417 F.3d 67, 70 (1st Cir.2005) (Brackets and emphasis added); *Correa v. Hospital San Francisco,* 69 F .3d 1184, 1192 (1st Cir. 1995) (citing *Baber,* 977 F.2d at 879); *see also Southard v. United Regional Health Care System, Inc.,* 2006 WL 1947312, *2 (N.D. Tex. 2006) (J. Roach) (citing, *inter alia, Battle ex rel. Battle v. Memorial Hosp. at Gulfport,* 228 F.3d 544, 557 (5th Cir. 2000) and *del Carmen Guadalupe v. Agosto,* 299 F.3d 15, 21 (1st Cir. 2002)).

23.     Thus, a hospital, like MTBH, which is subject to EMTALA, can violate EMTALA's screening examination requirement in at least two ways. First, liability attaches if a hospital's screening examination is not "'reasonably calculated to identify the patient's critical medical condition."  *See Southard,* 2006 WL 1947312, *2 *(quoting Agosto,* 299 F.3d at 21) (Emphasis in original). Second, liability attaches if "the hospital treats the patient differently from other patients with similar symptoms." *Id. (quoting Battle,* 228 F.3d at 557).

24.     At all relevant times, including the **1st and 2nd MTBH Emergency Department admissions,** EMTALA required MTBH to develop and uniformly provide screening procedures to identify critical conditions in symptomatic patients.  EMTALA recognizes that hospitals

across the United States have varying capabilities by modifying the phrase "appropriate medical screening examination" with the phrase, "within the capability of *the* hospital's emergency department, including ancillary services routinely available to *the* emergency department[.]" 42 U.S.C. § 1395dd(a) (Emphasis added). Thus, EMTALA did not establish a federal medical malpractice cause of action or a national standard of medical care.  *Southard,* 2006 WL 1947312, *2. Instead:

> [t]he plain language of the statute requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to *all* patients with similar complaints.

*Baber,* 977 F.2d at 879 (Emphasis added and footnote omitted); *see also Cruz-Queipo,* 417 F.3d at 70 ("When a hospital prescribes internal procedures for a screening examination, those internal procedures 'set the parameters for an appropriate screening.' A hospital must adhere to its own procedures in administering the screening examination."); *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 858 n.4 (4th Cir. 1994) (" ... the plain language of EMTALA requires hospitals to develop screening procedures and apply the procedures uniformly," pointing out that the "failure to have any screening procedures could itself be a violation of EMTALA …"). And, as the Fifth Circuit specifically held in *Battle:*

> Evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment.

228 F.3d at 558 (reinstating EMTALA screening claim where evidence showed hospital "failed to follow its own published standards in Daniel's case"); *Romo v. Union Mem. Hosp., Inc.,* 878 F.Supp. 837, 842 (W.D. N.C. 1995) (denying hospital's summary judgment on EMTALA screening claim, noting, "[T]he evidence presented here suggests that the procedure governing the taking and recording of vital signs, part of the nursing protocol which is presumably followed as a matter of routine, was not followed in Mr. Romo's case."); *Torres Otero v. Hosp. Gen.*

*Menonita,* 115 F.Supp.2d 253, 259 (D. P.R. 2000) (denying hospital's summary judgment on EMTALA screening claim, noting, "Plaintiffs have produced evidence that the Hospital only partially followed its protocol for patients reporting chest pain .... "); *Southard v. United Regional Health Care System, Inc.,* 2008 WL 4489692, *1 (N.D. Tex. 2008) (1. Sanderson) ("[Section 1395dd(a)] in turn requires that a hospital develop a screening procedure designed to identify such critical conditions which are present in symptomatic patients and to apply that screening procedure uniformly to *all* patients with similar complaints.") (Emphasis added).

25.    If a hospital does not develop standard screening procedures to identify critical conditions in symptomatic patients, EMTALA liability attaches for its failure to meet the standard of care to which the hospital adheres. Courts that have addressed the issue have uniformly held that a hospital cannot evade EMTALA by failing to develop "standards," or "standard policies dictating the medical screening that a patient with [the patient's] symptoms should receive." *Griffith v. Mt. Carmel Medical Center,* 831 F.Supp. 1532, 1542-43 (D. Kan. 1993) ("Mount Carmel has admitted that it has no standard policies dictating the medical screening that a patient with Mr. Griffith's symptoms should receive."); *Power,* 42 F.3d at 855-59 ("Arlington Hospital cannot simply hide behind this lack of standard emergency room procedures," citing *Griffith); Power v. Arlington Hosp. Ass'n,* 800 F.Supp. 1384, 1387 n.6 (E.D. VA 1992*), aff'd in part, rev'd in part,* 42 F.3d 851 (4th Cir. 1994). In such a case, "an EMTALA claim may be established through 'proof of a failure to meet the standard of care *to which the Hospital adheres.'" Power,* 42 F.3d at 858 (Emphasis in original); *Sastre v. Hosp. Doctor's Center, Inc.,* 93 F.Supp.2d 105, 110 (D. P.R. 2000) ("In successfully pursuing an EMTALA claim, it is up to the plaintiff to show that, in screening him or her, the hospital failed to follow the screening policy *or standard of care* which

it regularly follows for other patients presenting substantially similar conditions," citing *Power,*
42 F.3d at 858). And courts in the Northern District of Texas have held likewise:

> Martinez did not receive serial enzyme tests, serial EKGs, a cardiology consultation, or a
> cardiac perfusion scan. Although URHCS asserts that these tests were not required
> because the examining doctor did not consider them necessary in Martinez's case,
> *URHCS misunderstands the EMTALA inquiry.* If there was any departure from standard
> screening procedures, the screening was in violation of EMTALA. [citation omitted] The
> doctors' motivations for the departure are irrelevant. [citation omitted] .... This case is rife
> with fact issues precluding summary judgment. Plaintiffs have proffered evidence that
> Martinez's care might have differed from other patients who presented to the emergency
> department with chest pain, which precludes summary judgment in URHCS's favor. *See
> Southard v. United Reg'l Health Care Sys., Inc.,* No. 7:06-CV-OII-L, 2008 WL 5049299,
> at *4 (N.D.Tex. Nov. 26, 2008).

*See Martinez* v. *Porta,* 598 F.Supp.2d 807, 815 (N.D.Tex. 2009) (Means, J.) (Emphasis added);

*see also Southard,* 2008 WL 4489692, *1 ("In the present case Defendant's Rule 30(b)(6)

representative, Kimberly Stringfello, testified at her deposition that Defendant did not have an

established screening process for emergency department patients, that the responsibility of

determining what was required as an appropriate medical screening examination under the

EMTALA was delegated to the hospital's emergency department physicians - in this instance Dr.

Armando Moreno. Therefore, the steps in the screening procedure identified by Dr. Moreno as

being appropriate are those which 'set the parameters for an appropriate screening'" quoting

*Cruz-Queipo,* 417 F.3d at 70 and n.4). Thus, a plaintiff may carry "her threshold burden of proof

by presenting evidence of differential treatment" that shows the hospital's emergency room

physician deviated from his "typical" or "usual procedure" for screening patients in the

emergency room. *Power,* 42 F.3d at 855, 859;  *Griffith,* 831 F.Supp. at 1540.

26.     Though a hospital may have "attended to [the patient] and treated him with a variety, or []

'a battery', of tests and evaluations, it may still fall short of an 'appropriate medical screening."

*Romo,* 878 F.Supp. at 842; *Torres Otero,* 115 F.Supp.2d at 259 ("The Court disagrees with the

Hospital's contention that the provision of some testing or treatment to a patient *a priori* satisfies a hospital's statutory obligation," citing *Romo).* EMTALA mandates that when screening a patient, hospitals (including by and through their physicians) must follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions." *Torres Otero,* 115 F.Supp. at 258 (citing, *inter alia, Power,* 42 F.3d at 858 and *Marshall v. East Carroll Parish Hosp.,* 134 F.3d 319, 323-24 (5th Cir. 1998)).  So even if the evidence shows that a patient was "attended to" and "treated [] with a variety, or [] 'battery', of tests and evaluations" during the screening exam, "the Court would be remiss not to compare this particular screening with other indicia of the standard screening procedures." *Romo,* 878 F.Supp. at 842. The patient's screening exam may still fall short of an 'appropriate medical screening,' if there is evidence that the *nature, extent* and *timing* of these actions differs from the standard operating procedures received by other paying patients." *Id.* (Emphasis added) (rejecting "Defendant's argu[ment] that they performed numerous tests and evaluations, and therefore, the medical screening was appropriate within Union Memorial's capabilities"); *Torres Otero,* 115 F.Supp.2d at 259 (rejecting "Defendants argu[ment] that because it is uncontested that the Hospital performed a number of tests on co-Plaintiff Torres Otero after he presented himself at the Hospital's emergency room, including a CBC, and electrocardiogram, and CPK, Plaintiffs cannot maintain their cause of action for failure to appropriately screen"); *see, e.g. Battle,* 228 F.3d at 548-49, 558 (reinstating EMTALA screening claim, though patient was twice taken to the hospital and screened by physicians and twice misdiagnosed, where evidence showed *physicians* failed to follow one of hospital 's "Emergency Department *Nursing* Care Standards," stating in relevant part, "Memorial Hospital's policy may have been satisfied by further screening - that is, continued observation in the emergency room until the source of Daniel's fever and

infection was confirmed.") (Emphasis added); *Griffith,* 831 F.Supp. at 1534-35,1538 n4.
(rejecting hospital's argument "that the 'appropriate medical screening' requirement in EMTALA
merely requires a hospital to give' access' to medical screening examinations"--which for Mr.
Griffith included "a number of diagnostic tests, including a chest x-ray" and "[ m]ore diagnostic
tests [], including a CT scan of Mr. Griffith's brain, a complete blood count, and an analysis of
his arterial blood gases"--observing, "That is clearly an understatement of the duty imposed by
EMTALA.").

27.     EMTALA imposes "'strict liability' on a hospital which violates [EMTALA]'s
requirements." *Abercrombie v. Osteopathic Hosp. Founders Assoc.,* 950 F.2d 676, 681 (10th Cir.
1991); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C. Cir. 1991)
("[A]ny departure from standard screening procedures constitutes inappropriate screening in
violation of the Emergency Act. The motive for such departure is not important to this analysis,
which applies *whenever and/or whatever reason* a patient is denied the same level of care
provided others and guaranteed him or her by subsection l395dd(a)"); *Stevison v. Enid Health
Sys's,* 920 F.2d 710, 713 (10th Cir. 1990) ("We construe [section l395dd(a)] as imposing a strict
liability standard subject to those defenses available in the act."). Thus, a plaintiff is not required
to prove that the hospital or its personnel acted negligently. *Abercrombie,* 950 F.2d 680-81
(holding "district court's insertion of the word 'negligently' into [jury instruction] was error.").
Nor is a plaintiff required to prove "the inner thoughts and prejudices of attending physicians ...
in order to recover under EMTALA." *Power,* 42 F.3d at 857-58 (" ... nothing in the statute []
requires proof of indigence, inability to pay, or any other improper motive ... [,]" and "having to
prove the existence of improper motive on the part of a hospital, its employees or its physicians,
would make a civil EMTALA claim virtually impossible."); *see Roberts v. Galen of Virginia,*

*Inc.,* 525 U.S. 249, 253, 119 S.Ct. 685, 687 (1999) (holding that "§1395dd(b) contains no express or implied "improper motive" requirement."); *Burditt v. US. Dept. of Health & Human Serv.,* 934 F.2d 1362, 1373 (5th Cir. 1991)(same); *Porta* 598 F.Supp.2d at 815 ("If there was any departure from standard screening procedures, the screening was in violation of EMTALA. [citation omitted] The doctors' motivations for the departure are irrelevant. [citation omitted]"); *Southard,*2008 WL 4489692, *2 ("The bona fides or motivation of the agents and employees of a hospital's emergency department is irrelevant to whether the provisions of the EMTALA have been violated" *citing Power).*

28.     Further, MTBH and Durairaj were required to provide King with care and treatment in compliance with the applicable standards of care.  MTBH and Durairaj fell below the applicable standards of care in their care and treatment of King.

29.     MTBH triage nurse Rebecca Krett, R.N. documented, "This is patient's 3rd visit to an emergency department for same complaint of neck/upper back pain.  States that now he is unable to walk and arms feel weak and numb.   Patient comes into emergency department for evaluation."  At around 10:59 a.m., nurse Bradley Marron, RN, documented, "Muscle strength: right sided upper and lower extremity weakness.  0/5 on right lower extremity.  1/5 on right upper extremity.  There is right-sided weakness."   King was placed on a bed in the hallway where he waited.

30.     A full two hours after King's arrived at MTBH, Durairaj, finally saw King at around 11:51 a.m.  Record of his involvement is found on a form called, "Emergency Physician Record – Neck or Upper Back Injury/Pain" containing the following entries:

> Chief complaint neck/back pain.  Onset 8 days ago … no recent injury … patient complaining of muscular spasms and neck pain x past 8 days.  This morning at about 0230, patient began having numbness and motor deficits to all extremities.  Severity of pain: mild. Quality: dull, similar to prior back pain(s). Associated symptoms:

numbness/tingling.  Exacerbated by nothing.  Relieved by nothing.  Similar symptoms previously.  Recently seen/treated by doctor 5 days ago.  Seen at ED for same complaints, given unknown injection and patient was able to move again.  Review of Systems:  all systems negative … Social History:  not a smoker.  No alcohol … Nursing Assessment Reviewed.  Vitals Reviewed.  Physical Exam:  General Appearance:  alert.  [Eyes not examined].  Ears, Nose, Throat:  [not examined].  *Neck:  [not examined].*  *NEXUS criteria:  [not done]* [The NEXUS Criteria were developed to help physicians determine whether cervical spine imagining could be safely avoided in appropriate patients] … Neuro/Psych:  oriented x 4.  *Motor nml: [not checked].  Sensation nml:  [not checked].  Grips normal/symmetrical:  [not checked].  Reflexes nml:  [not checked].*  Decreased grip.  Patient not moving extremities but moves when distracted.  *[Nothing regarding rectal exam] No labs, EKG or X-rays performed*.  Progress:  patient able to move extremities when distracted … Counseled patient regarding diagnosis and need for follow-up.  Prescription given for cyclobenzaprine.  Clinical Impression:  Muscle spasm *[Epidural abscess/mass listed among options not circled]*.  Condition at disposition:  stable.  *Discharged 12:06*.  **Emergency Medical Condition stabilized**.  (Emphasis added).

31      At around 11:54 a.m., Durairaj ordered and King received Toradol 60 mg IM and Norflex 60 mg IM.  His pain at time of discharge was still 8 on a scale of 10.  King was diagnosed with muscle spasm/paravertebral muscle spasm, given a prescription for cyclobenzaprine and discharge instructions to "follow up with primary care doctor this week to *order MRI if he thinks symptoms warrant*" and discharged shortly after noon. (Emphasis added).  Tonia King, King's sister, had to sign the discharge papers because King could not.

32.     Durairaj saw King at 11:51 a.m., ordered Toradol and Norflex at 11:54 a.m., and discharged King at 12:06 p.m., a mere 15 minutes after seeing King and 11 minutes after ordering pain medications, during which time Durairaj performed what should have been a medical screening examination.

33.     During the entirety of King's first admission to MTBH's emergency department, he had a large ventral epidural abscess centered at cervical vertebrae 4 and 5 (C4-5 epidural abscess); i.e., a collection of pus next to and pressing on the front of the spinal cord at the level of the 4th and 5th cervical vertebrae.

**PLAINTIFFS' FIRST AMENDED COMPLAINT**                                                    **Page 14**

34.     King's C4-5 epidural abscess manifested itself with signs and symptoms that were substantially similar to other adult patients of MTBH's emergency department who present with and suffer from central nervous system conditions localized to the cervical spinal cord, as evidenced by pain emanating from the neck, and manifesting as motor deficits/weakness and/or sensory deficits/numbness/loss of sensation. Indeed, King was brought to MTBH emergency department by the San Antonio Fire Department in response to a call regarding "Stroke/CVA" (cerebrovascular accident).

35.     King was not the first person admitted to the MTBH emergency department with signs and symptoms indicating the presence of an underlying central nervous system condition localized to the cervical spinal cord as evidenced by pain emanating from the neck, and manifesting as motor deficits/weakness and sensory deficits/numbness/loss of sensation.  Prior to and after July 20, 2015, numerous patients with the same or similar signs and symptoms to those King manifested during his July 20, 2015 emergency department admission, had been admitted to MTBH's emergency department.   Prior to and after July 20, 2015, numerous patients with the same or similar signs and symptoms to those King manifested during his July 20, 2015 emergency department admission, were provided medical screening examinations to identify the presence or confirm the absence of an underlying central nervous system condition localized to the cervical spinal cord as evidenced by pain emanating from the neck, and manifesting as motor deficits/weakness and/or sensory deficits/numbness/loss of sensation.  Prior to and after July 20, 2015, numerous patients with the same or similar signs and symptoms to those King manifested during his July 20, 2015 emergency department admission; i.e., neck pain and neurologic deficits including muscle weakness and sensory deficits, were provided:

- A  physical  examination  including  neurological  examination  including  (1)

examination of the neck; (2) examination of graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) and evaluation of gait or ability to walk;

- magnetic resonance imaging (MRI) of the neck; and

- consultation with physicians specializing in neurology and neurosurgery—

as part of screening examinations to identify the presence or confirm the absence of an underlying central nervous system condition localized to the cervical spinal cord.

36.    At no point during King's July 20, 2015 first admission to MTBH's emergency department did MTBH's staff including Durairaj provide uninsured King with:

- A physical examination including neurological examination including (1) examination of the neck; (2) examination of graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk;

- magnetic resonance imaging (MRI) of the neck; and

- consultation with physicians specializing in neurology and neurosurgery.

37.    On July 20, 2015, MTBH's emergency department including Durairaj and Ramey cared for and treated uninsured King disparately from other patients with the same or similar symptoms and below the standard of care by depriving King of among other things:

- A physical examination including neurological examination including (1)

examination of the neck; (2) examination of graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk;

- magnetic resonance imaging (MRI) of the neck; and

- consultation with physicians specializing in neurology and neurosurgery—

as part of screening examinations to identify the presence or confirm the absence of an underlying central nervous system condition localized to the cervical spinal cord.

38.    During King's July 20, 2015 first emergency department admission, MTBH and Durairaj administered medication – Toradol and Norflex - to Mr. King that masked a portion of the symptoms caused by his C4-5 epidural abscess.

39.    Despite the administration of symptom-masking medication, at no point in time during King's first July 20, 2015 MTBH emergency department admission did his neurologic deficits resolve or improve.

40.    Because MTBH and Durairaj made the decision to discharge uninsured King after Durairaj saw him for no more than 15 minutes, Durairaj gave King a pretextual primary diagnosis of "muscle spasm", when Durairaj never examined King's neck where any such muscle spasm might have been, to make it appear that King was appropriate for discharge.

41.    Durairaj's pretextual diagnosis of "muscle spasm" could not and does not cause neurological deficits including numbness and weakness, such as King suffered.

42.    At discharge, King was told to "follow up with primary care doctor this week to ***order MRI if he thinks symptoms warrant***" (emphasis added).  MRI is not indicated for muscle spasm.

MRI is indicated for central nervous system conditions including those localized to the cervical spinal cord in the region of King's neck pain.

43.     During the first July 20, 2015 MTBH emergency department admission, King was not given the same medical screening examinations provided to other patients with the same or similar signs and symptoms and was not provided with care and treatment that complied with the applicable standards of care.

44.     During the first July 20, 2015 MTBH emergency department admission, King was not provided a medical screening examination consistent with the applicable national standard of care medical examination that has been provided for other MTBH emergency department patients with the same or similar signs and symptoms and, therefore, the medical screening examination provided to King departed from MTBH's policies and the applicable national standard of care medical examination that has been provided for other MTBH emergency department patients.  King was also not provided with care and treatment that complied with the applicable standards of care.

45.     Prior to discharging/dumping uninsured King from MTBH's emergency department on July 20, 2015, MTBH failed to provide King an appropriate medical screening examination within the capability of MTBH's emergency department.

46.     During the first July 20, 2015 MTBH emergency department admission, King had emergency medical conditions which were not stabilized; and, in spite of his unstabilized emergency medical conditions, MTBH discharged/dumped uninsured King from its emergency department.

47.     At the time King was discharged from MTBH's emergency department, MTBH emergency department staff members, including Durairaj, had actual knowledge of one or more

of King's emergency medical conditions including neurologic deficits of muscle weakness and numbness.

48.     Following discharge, King could not walk unassisted from the MTBH emergency department.  He had to be lifted into a car.   His daughter went back into MTBH and asked to speak with someone in charge.  Around this time, another gentleman told the MTBH staff that King had fallen outside.  King was wheeled back into the MTBH emergency department.

49.     **4ᵗʰ Emergency Department admission (2ⁿᵈ MTBH admission).**  King was logged into MTBH emergency department for the second time that Monday, July 20, 2015, around 1:56 p.m., less than two hours from his previous MTBH discharge.  King requested an examination and treatment for a medical condition. U.S.C. §1395dd(a).   EMTALA required MTBH to provide King "an appropriate medical screening examination within the capacity of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exist[ed]."  42 U.S.C. §1395dd(a) (Parenthetical in original).  At 1:58 p.m., King was triaged and sent to the waiting room where he remained for around five hours before being seen by Durairaj to initiate and complete a medical screening examination.

50.     At around 2:11 p.m., Defendant Lonny Ramey, P.A. initiated a medical screening examination by ordering testing on King including serum lipase and amylase (tests for pancreatitis), troponin I and CK MB (tests for heart ischemia), comprehensive metabolic panel, partial thromboplastin and prothrombin time (tests for blood clotting), complete blood count (CBC) with differential count, ECG, and chest x-ray.  Ramey did not actually see King nor did he facilitate moving King from the waiting area to an examination room, performed no history or examination of King, did not notify Durairaj of the need for a timely examination by Durairaj,

and curiously ordered tests for diseases wholly inconsistent with King's complaints and presentation, e.g. lipase and amylase for pancreatitis characterized by abdominal pain when King did not have abdominal pain; and troponin and ECG for patients with chest pain suggestive of cardiac ischemia when King did not have chest pain.   Ramey's contribution to any medical screening examination was as if Ramey was ordering tests for another patient.

51.    At around 3 p.m., ECG was interpreted to show normal sinus rhythm, biatrial enlargement, and left ventricular hypertrophy.

52.    At around 3:35 p.m., CBC showed a high white blood cell count (WBC) with left shift, consistent with bacterial infection.

53.    At around 4:00 p.m., comprehensive metabolic panel, troponin I, and CK MB were unremarkable

54.    Not until 6:00 p.m., four hours later, did the MTBH nurses perform another assessment reporting, most relevantly:

> Moves all extremities with symmetry of strength…No reported gait disturbance. No reported numbness, tingling or loss of sensation… There is pain noted over the right upper arm and biceps…Neurovascular exam intact.  There is pain noted over the left upper arm and biceps…There is pain noted over the left anterior thigh…Patient complains of numbness and tingling to all extremities that has progressed this past week. Patient has been seen at 3 other hospitals and here this a.m. and has been discharged with muscle spasms but the family would like more tests done.  Patient states he has shocking pain that radiates down his back and his arms when touching extremities patient denied feeling touch however withdrew with painful stimuli.

55.    Still around 6:00 p.m., and contrary to the note above, the nursing staff documented "unable to assess get up and go test" as part of the Hendrich II Fall Risk assessment.

56.    Durairaj did not see King until around 6:52 p.m., near Durairaj's shift's end, and after King sat in the waiting room approximately five hours.   Durairaj picked up where Ramey left off to complete any medical screening examination.  Record of Durairaj's involvement during

this "bounce back" admission is found this time on a different form called, "Emergency Physician Record – Neuro Symptoms/Deficit" containing the following entries:

> chief complaint: ***weakness***.  Onset 7 days ago. [7 hours earlier Dr. Durairaj documented onset was 8 days ago] … Family insists something is wrong; want MRI.  Patient told he was fine by 2 different hospitals in past week.  Family states patient fell this morning, but no other recent trauma or injury.  Character of deficits:  blank.  Associated symptoms: hot…neck/back pain…Recently see/treated by doctor:  CT scan at Methodist – normal [Methodist did not perform any CT scans during Mr. King's 7/16/15 emergency department admission]; told it was muscle spasms causing problems…Review of Systems:  …neck/back pain:  "shock" feeling…Procedures:  CT scan…Physical Exam: ***…Neuro/Psych:  blank except oriented x 4 and moves extremities with painful stimuli***…Neck: supple, no stiff neck or meningismus…Extremities: nontender, nml ROM line through…***Rectal exam: blank*** … CT C-spine [20:16]: – no fracture or subluxation … CT head [20:13]:  finding most consistent with small amount of subdural hematoma along the posterior falx … Progress:  2138 paging for transfer … Clinical Impression: subdural hematoma, cervical pain, HTN.  Disposition decision time 2154.  Transfer (Emphasis added).

57.     Head CT, ordered at around 7:03 p.m. by Durairaj and timed 8:13 p.m., was interpreted to show:  small amount of subdural hematoma along the posterior falx, and no intraparenchymal disease.

58.     Cervical CT, ordered at around 7:03 p.m. by Durairaj and timed 8:16 p.m., was interpreted to show:  degenerative disc disease, and no fracture or subluxation.

59.     Lumbar CT, ordered at around 7:03 p.m. by Durairaj and timed 8:26 p.m., with history of trauma with inability to walk, was interpreted to show degenerative disc disease, no fracture or subluxation, and bladder distention.

60.     Thoracic CT, ordered at around 7:03 p.m. by Durairaj and timed 8:42 p.m., was interpreted to show degenerative disc disease, no definite acute fracture or subluxation, and right upper lung consolidation consistent with atelectasis versus infectious infiltrate.

61.     During the entirety of his second admission to MTBH's emergency department, King had a C4-5 epidural abscess.

62.     King's C4-5 epidural abscess manifested itself with signs and symptoms that were substantially similar to other adult patients of MTBH's emergency department who present with and suffer from a central nervous system condition localized to the cervical spinal cord, as evidenced by pain emanating from the neck, and manifesting as motor deficits/weakness and sensory deficits/numbness/loss of sensation.

63.     King was not the first person admitted to the MTBH emergency department with signs and symptoms indicating the presence of an underlying central nervous system condition localized to the cervical spinal cord.  Prior to and after July 20, 2015, numerous patients with the same or similar signs and symptoms to those King manifested during his July 20, 2015 emergency department admission, had been admitted to MTBH's emergency department.   Prior to and after July 20, 2015, numerous patients with the same or similar signs and symptoms to those King manifested during his July 20, 2015 emergency department admission, were provided timely medical screening examinations to identify the presence or confirm the absence of an underlying central nervous system condition localized to the cervical spinal cord.  Prior to and after July 20, 2015, numerous patients with the same or similar signs and symptoms to those King manifested during his July 20, 2015 emergency department admission, were timely provided:

- A timely physical examination including neurological examination including (1) examination of the neck; (2) examination of graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk; and (7) rectal/anal examination assessing

rectal tone or absence thereof;

- magnetic resonance imaging (MRI) of the neck; and

- consultation with physicians specializing in neurology and neurosurgery—

- magnetic resonance imaging (MRI) of the neck;

- consultation with physicians specializing in neurology and neurosurgery—

as part of timely screening examinations to identify the presence or confirm the absence of an underlying central nervous system condition localized to the cervical spinal cord.

64.    At no point during King's July 20, 2015 second admission to MTBH's emergency department did MTBH's staff, Durairaj or Ramey provide uninsured King with:

- A timely physical examination including neurological examination including (1) examination of the neck; (2) examination of graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk; and (7) rectal/anal examination assessing rectal tone or absence thereof;

- magnetic resonance imaging (MRI) of the neck;

- consultation with physicians specializing in neurology and neurosurgery.

65.    On July 20, 2015, MTBH's emergency department including Durairaj and Ramey treated uninsured King disparately from other patients with the same or similar symptoms and fell below the applicable standards of care by depriving King of among other things:

- A timely physical examination including neurological examination including (1) examination of the neck; (2 examination of graded muscle strength in all 4

extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk; and (7) rectal/anal examination assessing rectal tone or absence thereof;

- magnetic resonance imaging (MRI) of the neck;

- consultation with physicians specializing in neurology and neurosurgery—

as part of timely screening examinations to identify the presence or confirm the absence of an underlying central nervous system condition localized to the cervical spinal cord.

66.     Further, MTBH, Durairaj, and Ramey were required to provide King with care and treatment in compliance with the applicable standards of care.  MTBH, Durairaj, and Ramey fell below the applicable standards of care in their care and treatment of King.

67.     During King's July 20, 2015 second emergency department admission, at around 7:31 p.m., MTBH and Durairaj ordered and administered medication  - Valium and Morphine - to King that masked a portion of the symptoms caused by his C4-5 epidural abscess.

68.     Despite the administration of symptom-masking medication, at no point in time during King's second July 20, 2015 MTBH emergency department admission did his neurologic deficits resolve or improve.

69.     During the second July 20, 2015 MTBH emergency department admission, King was not given the same timely medical screening examinations provided to other patients with the same or similar signs and symptoms and was not provided with care consistent with the applicable standards of care.

70.     During the second July 20, 2015 MTBH emergency department admission, King was not provided a timely medical screening examination consistent with the applicable national standard of care medical examination that has been provided for other MTBH emergency department patients with the same or similar signs and symptoms and, therefore, the medical screening examination provided to King departed from MTBH's policies and the applicable national standard of care medical examination that has been provided for other MTBH emergency department patients with the same or similar signs and symptoms.

71.     During the second July 20, 2015 MTBH emergency department admission, MTBH failed to provide King an appropriate medical screening examination within the capability of MTBH's emergency department.  Even if the evidence shows that a patient was "attended to" and "treated [] with a variety, or [] 'battery', of tests and evaluations" during the screening exam, "the Court would be remiss not to compare this particular screening with other indicia of the standard screening procedures." *Romo,* 878 F.Supp. at 842. The patient's screening exam may still fall short of an 'appropriate medical screening,' if there is evidence that the *nature, extent* and *timing* of these actions differ from the standard operating procedures received by other paying patients." *Id.* (Emphasis added).   The medical screening examination provided King by MTBH's emergency department did not occur for approximately five hours and then did not include neurological examination including (1) examination of graded muscle strength in all 4 extremities; (2) examination of sensation in all 4 extremities, neck, and front and back of the torso; (3) examination of proprioception in all 4 extremities; (4) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (5) evaluation of gait or ability to walk; and (6) rectal/anal examination assessing rectal tone or absence thereof;

(6) magnetic resonance imaging (MRI) of the neck; and (7) consultation with physicians specializing in neurology and neurosurgery.

72.     Around 9:37 p.m., University Hospital, San Antonio, and MTBH providers discussed King's transfer for care and treatment of a subdural hematoma.  However, King did not have a subdural hematoma; he had a C4-5 epidural abscess.

73.     Around 9:49 p.m., Acadian ambulance service was contacted regarding transfer.

74.     At around 10:18 p.m., King began his transfer via Acadian ambulance to University Hospital.

75.     While under their care, MTBH emergency department staff members, including Durairaj and Ramey, had actual knowledge of one or more of King's emergency medical conditions including neurologic deficits of muscle weakness and numbness.

76.     While King sat in the MTBH waiting area for four hours, waited five hours to be seen by Durairaj, and remained in the MTBH emergency department for another four hours without any definitive treatment for his C4-5 epidural abscess, his spinal cord compression by the C4-5 epidural abscess went unrelieved causing injury to his spinal cord.

77.     **University Hospital**.  King arrived at University Hospital around 10:35 p.m., July 20, 2015.  Subsequent examination was significant for C-spine tenderness on palpation, neurologic deficits/impairment from C4 and below, 1/5 strength, no sensation from T4 and below, and no rectal tone.  Cervical CT at around 11:31 p.m. was interpreted to show: 1) no cervical spine fracture or dislocation; and 2) multilevel degenerative disc disease with neural foraminal narrowing and spinal canal stenosis. Head CT was interpreted to show no hemorrhage or abnormality including no subdural hematoma, the reason King was transferred.  At around 1:00 a.m., July 21, 2015, neurosurgery saw King for quadriplegia and possible subdural hematoma.

Stat cervical MRI showed a large ventral epidural fluid collection suspicious for abscess centered at C4-5 and spinal cord compression.  King was taken to the operating room for decompression of his spinal cord, debridement of a retropharyngeal abscess and a ventral epidural spinal abscess and diskitis C4-5, anterior cervical discectomy and fusion C4-5, PEEK interbody cage at C4-5, and anterior cervical plating C4-5.

78.     Despite surgical intervention, King has been left with permanent cervical spinal cord injury causing quadriplegia/paresis.

79.     Had MTBH, Durairaj, and/or Ramey, during the 1st or 2nd MTBH emergency department admissions provided King with care and treatment consistent with the applicable standards of care and/or appropriate medical screening examinations including a timely physical examination including neurological examination (1) including examination of neck; (2) graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk; and (7) during the second visit, rectal/anal examination assessing rectal tone or absence thereof; and/or further had magnetic resonance imaging (MRI) of the neck; and consultation with physicians specializing in neurology and neurosurgery, King would have been provided earlier neurosurgical treatment to timely relieve/decompress spinal cord compression by his C4-5 epidural abscess and would not have suffered permanent spinal cord injury causing quadriplegia.  Similarly, had King been stabilized rather than discharged unstable during the first MTBH emergency department admission, he would have been provided earlier neurosurgical treatment to timely relieve/decompress spinal cord compression by his C4-5

epidural abscess and would not have suffered permanent spinal cord injury causing quadriplegia. Instead, King was cared for and treated below the applicable standards of care and disparately from other MTBH emergency department patients with the same or similar signs and symptoms, was deprived of appropriate medical screening examinations under EMTALA, and was discharged unstable from the MTBH emergency department.  As a result of the failure to provide King appropriate medical screening examinations under EMTALA and care and treatment consistent with the applicable standards of care, and discharging King unstable, King's C4-5 epidural abscess went undetected and untreated.  As a result of the failure to provide King appropriate medical screening examinations under EMTALA and care consistent with the applicable standards of care, and discharging King unstable, King's untreated C4-5 epidural abscess was allowed to cause serious physical injuries and impairment, including quadriplegia that he continues to struggle with to this very day and will for the rest of his life.

80.     At all relevant times, Durairaj and Ramey represented to King and the public at large that they were competent and as such were engaged in the practice of their professions, individually and as agents, servants and/or employees, actual and/or ostensible, of MTBH. Further, Durairaj had investigations and/or disciplinary actions against his medical license and/or professional activities in Louisiana, Arkansas, and Texas.

81.     At all relevant times, MTBH was a hospital facility located in Bexar County, Texas, licensed by the state of Texas to provide medical care and represented to King and the public at large that it was a competent medical facility and that the physicians, physicians assistants, nurses and healthcare providers associated therewith were duly licensed, competent physicians, physicians assistants, nurses and healthcare providers. MTBH failed to stabilize King prior to

discharge despite actual knowledge of neurological deficits to his extremities, an emergency medical condition.

82.     MTBH was aware King was uninsured, unemployed, and had no apparent ability to pay when it failed to perform appropriate medical screening examinations, stabilization and when it discharged King.   After discharge from MTBH, King's condition constituted an emergency medical condition manifesting itself by acute onset of paralysis such that in the absence of immediate medical attention it could be expected to, and did actually result in the serious and permanent impairment of his bodily functions and serious and permanent dysfunction of his limbs. Had MTBH not discharged/dumped uninsured King when he was not stable, but instead performed a physical examination including neurological examination including (1) examination of the neck; (2) examination of graded muscle strength in all 4 extremities; (3) examination of sensation in all 4 extremities, neck, and front and back of the torso; (4) examination of proprioception in all 4 extremities; (5) examination of reflexes including pathological reflexes such as the Babinski test in all 4 extremities; (6) evaluation of gait or ability to walk; and (7) rectal/anal examination assessing rectal tone or absence thereof; and/or further had magnetic resonance imaging (MRI) of the neck; and consultation with physicians specializing in neurology and neurosurgery, King would have been provided earlier neurosurgical treatment to timely relieve/decompress spinal cord compression by his C4-5 epidural abscess and would not have suffered permanent spinal cord injury causing quadriplegia/paresis.

### VII. CAUSE OF ACTION AND DAMAGES (MTBH)

### A. COUNT ONE

83.     King brings the following cause of action against MTBH:

84.     At the times King was cared for and treated at MTBH emergency department, MTBH was a hospital participating in Medicare under a Provider Agreement with the Secretary of the Department of health and Human Services (Medicare) and maintained an Emergency Department and provided emergency services in such a way and under such conditions as to subject MTBH to the provisions of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395dd, *et seq.* ("EMTALA"). Under the provisions of EMTALA, each of the personnel who examined, treated and/or provided care or treatment recommendations for King, including Durairaj, Ramey, and the nursing staff were employees and/or agents of MTBH and were acting within the course and scope of their employment and/or agency. With respect to compliance with EMTALA, Durairaj, Ramey, and the nurses were all agents of MTBH.

85.     On the first July 20, 2015 admission to the MTBH emergency department, MTBH failed to perform the required appropriate medical screening examination, when it failed to perform neck and neurological examinations, failed to obtain a cervical MRI, and/or failed to obtain consultations with specialists in neurology and/or neurosurgery. Such screening would have been provided to any other person similarly situated presenting to MTBH with similar signs and symptoms and was therefore disparate. Said screening may not have been afforded to King because he was an unemployed and uninsured person with no apparent ability to pay.  Such failure to provide an appropriate medical screening examination was a producing, proximate and legal cause of the injuries and damages to Plaintiffs in an amount in excess of the minimum jurisdictional limits of the court.

86.     On the first July 20, 2015 admission to MTBH emergency department, MTBH had actual knowledge that King was suffering from a recent onset of severe neck pain and motor and sensory deficits in his extremities and violated its obligation to King under EMTALA, including

**PLAINTIFFS' FIRST AMENDED COMPLAINT**                                      **Page 30**

the duty to stabilize the emergency medical condition of which it had actual knowledge, when it discharged King without stabilizing his emergency medical condition and failed to transfer him to another hospital. Instead, King was told to follow-up with a non-existent PCP and recommended to have a MRI. At the time he was discharged, King's condition constituted an emergency medical condition manifesting itself by recent onset of severe pain and motor and sensory deficits such that in the absence of immediate medical attention it could be expected to, and did actually result in serious and permanent impairment of his bodily functions and serious and permanent dysfunction of his limbs. Each of these violations was a proximate, producing, and legal cause of the injuries and damages to Plaintiffs in an amount in excess of the minimum jurisdictional limits of the court.

87.     On the second July 20, 2015 admission to MTBH emergency department, MTBH failed to perform the required appropriate medical screening examination, when it failed to timely perform neck and neurological examinations; failed to obtain a cervical MRI, and/or failed to timely obtain consultations with specialists in neurology and/or neurosurgery.  Such timely screening would have been provided to any other person similarly situated presenting to MTBH with similar symptoms and was therefore disparate. Said screening may not have been afforded to King because he was an unemployed and uninsured person with no apparent ability to pay. Such failure to provide an appropriate medical screening examination was a producing, proximate and legal cause of the injuries and damages to Plaintiffs in an amount in excess of the minimum jurisdictional limits of the court.

88.     On the second July 20, 2015 admission to MTBH emergency department, MTBH had actual knowledge that King was suffering from a recent onset of severe neck pain and motor and sensory deficits in his extremities and violated its obligation to King under EMTALA, including

the duty to stabilize the emergency medical condition of which it had actual knowledge, when it delayed transferring King without stabilizing his emergency medical condition. At the time he was finally transferred, King's condition constituted an emergency medical condition manifesting itself by recent onset of severe pain and motor and sensory deficits such that in the absence of immediate medical attention it could be expected to, and did actually result in serious and permanent impairment of his bodily functions and serious and permanent dysfunction of his limbs. Each of these violations was a proximate, producing, and legal cause of the injuries and damages to Plaintiffs in an amount in excess of the minimum jurisdictional limits of the court.

   A.    As described above, MTBH directly and vicariously through its emergency department staff physician, Durairaj, and physicians assistant, Ramey, violated Title 42 U.S.C.A. § 1395dd(a) and (c).  During each of King's two separate July 20, 2015 admissions to MTBH's emergency department, emergency department staff members failed to provide King with appropriate medical screening examinations within the capability of MTBH"s emergency department to determine whether or not an emergency medical condition existed.  As more fully described above, during each of King's two separate July 20, 2015 MTBH emergency department admissions, he was not given the same medical screening examination as MTBH provided to other patients with the same or similar signs and signs prior to and after July 20, 2015 nor was King provided a medical screening examination that was consistent with the applicable national standard of care medical examination that has been provided for other MTBH emergency department patients.  Thus, MTBH treated uninsured King disparately from other patients with the same or similar signs, symptoms, and/or emergency medical conditions as those of King in violation of MTBH's policies and the applicable national standard of care

medical examination that has been provided for other MTBH emergency department patients.  Moreover, during both of King's July 20, 2015 MTBH emergency department admissions, he had an emergency medical condition that was not stabilized; and, in spite of his unstabilized emergency medical condition, MTBH discharged or transferred King from its emergency department when he was unstable.  Further, at the times King was discharged/transferred from MTBH's emergency department, MTBH's emergency department staff members had actual knowledge of one or more of King's emergency medical conditions.

B.       As a direct result of MTBH's violations of Title 42 U.S.C.A. § 1395dd(a) and (c), King suffered severe and permanent personal injuries.  Pursuant to Title 42 U.S.C.A. § 1395dd(d)(2)(A), King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas.  Such damages include past and future physical pain and mental anguish, loss of earning capacity, disfigurement, physical impairment, and medical care expenses. Because MTBH's violation of EMTALA rises to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to hospitals generally so that MTBH and others similarly situated in this nation will change their methods of caring for patient like King.

89.     Plaintiff Latanya Walker-King is the wife of King.  As a direct result of MTBH's violations of Title 42 U.S.C.A. § 1395dd(a) and (c), King suffered severe and permanent personal injuries.  Pursuant to Title 42 U.S.C.A. § 1395dd(d)(2)(A), Latanya Walker-King is entitled to recover and seeks recovery of those elements/types of damages available for personal

injury under the law of Texas that are available to the spouse of a person like King who has sustained personal injuries.   Such damages include past and future loss of services, household services and consortium.   Latanya Walker-King hereby pleads for each and all such past and future damages.   Latanya Walker-King seeks an award of exemplary damages inasmuch as MTBH's violation of EMTALA rises to and exceeds the level of gross negligence, as that term is defined in law.

## B. COUNT TWO

90.     Plaintiffs reallege and incorporate by reference all previous and subsequent paragraphs herein.

91.     By reason of the facts set forth above, MTBH by and through its employees and agents, physicians, physicians assistants, nurses, and health care providers, who were acting within the course and scope of their agency and/or employment at MTBH, was negligent, grossly negligent, and/or willfully and wantonly negligent in failing to properly carry out its responsibilities to King in accordance with accepted standards of medical, nursing and/or hospital practice, thereby proximately causing injuries and damages to Plaintiffs.

92.     At all times material hereto, there existed an ostensible agency and/or an agency by estoppel relationship between MTBH, Durairaj, and Ramey, and as a result of which Defendants are estopped to deny said agency relationship. Plaintiffs were entitled to rely upon and did rely upon said agency relationship.

93.     These acts and/or omissions of the aforementioned physicians, physicians assistants, nurses, hospital and health care providers include, but are not limited to, the following: (1) improper care and treatment of King's complaints of severe neck and upper back pain, and neurological signs and symptoms, (2) failure to timely and properly triage, assess, obtain a

complete history, perform serial assessments and timely report King's presence, signs and symptoms including weakness and numbness to a physician; (3) failure to timely diagnose, assess and/or treat the cause of King's signs and symptoms, to wit- a C4-5 epidural abscess; (4) failure to timely place King in an examination room where he could receive timely and proper care by a physician and nursing staff; (5) failure to have King timely seen by a physician; (6) failure to advocate for continued assessment, monitoring, retention, and care of King and question the propriety of discharging King including using the chain of command if necessary; (7) failure to timely report to a physician that King could not leave the emergency department and get into a car without undue assistance; (8) failure to timely facilitate procurement of the necessary diagnostics including proper physical examination and MRI of the cervical spine; (9) failure to have specialists including neurologists and neurosurgeons on call to the emergency department; (10) failure to timely facilitate neurological and neurosurgical consults; (11) failure to facilitate timely admission of King to a hospital; (12) discharging King without performing proper and timely assessments, examinations, and procedures and at a time when he was unstable; (13) failure to timely facilitate transfer of King to a facility with neurosurgical services; (14) failure to timely and properly perform serial assessments and report the results to a physician; (15) in not obtaining medical records or information from King's prior emergency department admissions; to name a few.

94.     The acts and/or omissions of Defendant MTBH constitute health care liability, negligence, gross negligence, and/or willful or wanton negligence as those terms are utilized in Chapter 74 of the Texas Civil Practice & Remedies Code, and the common and statutory law of torts.

95.     Such health care liability, negligence, gross negligence and/or willful or wanton negligence was a proximate cause of the personal injuries and damages incurred by Plaintiffs herein as set forth in detail above and below.

96.     As a direct result of Defendant MTBH's negligent acts and/or omissions, King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas.  Such damages include past and future physical pain and mental anguish, loss of earning capacity, disfigurement, physical impairment, and medical care expenses. Because MTBH's negligent acts and/or omissions rise to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to hospitals generally so that MTBH and others similarly situated in this nation will change their methods of caring for patient like King.

97.     As a direct result of Defendant MTBH's negligent acts and/or omissions, Latanya Walker-King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas that are available to the spouse of a person like King who has sustained personal injuries.  Such damages include past and future loss of services, household services and consortium.   Latanya Walker-King hereby pleads for each and all such past and future damages.  Latanya Walker-King seeks an award of exemplary damages inasmuch as MTBH's negligent acts and/or omissions rise to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to hospitals generally so that MTBH and others similarly situated in this nation will change their methods of caring for patient like King.

## VIII. CAUSE OF ACTION AND DAMAGES (DURAIRAJ)

98.     By reason of the facts set forth above, Durairaj was negligent, grossly negligent, and/or willfully and wantonly negligent in failing to properly carry out his medical responsibilities to King in accordance with accepted standards of medical practice, thereby proximately causing injuries and damages to Plaintiffs.

99.     These acts and/or omissions of Durairaj include, but are not limited to, the following: (1) improper care and treatment of King's complaints of severe neck and upper back pain, and neurological signs and symptoms, (2) failure to timely diagnose and treat the cause of King's signs and symptoms, to wit- a C4-5 epidural abscess; (3) failure to timely obtain the necessary diagnostics including proper physical examination and MRI of the cervical spine; (4) failure to timely obtain neurological and neurosurgical consults; (5) failure to timely admit King; *(6)* discharging King without performing proper assessments, examinations, and procedures and at a time when he was unstable; (7) failure to timely transfer King to a facility with neurosurgical services; (8) failure to timely see King; (9) failure to perform a timely and proper physical examination of King; (10) in not obtaining medical records or information from King's prior emergency department admissions; to name a few.

100.    The acts and/or omissions of Durairaj constitute health care liability, negligence, gross negligence, and/or willful or wanton negligence as those terms are utilized in Chapter 74 of the Texas Civil Practice & Remedies Code and the common and statutory law of torts.

101.    Such health care liability, negligence, gross negligence and/or willful or wanton negligence was a proximate cause of the personal injuries and damages incurred by Plaintiffs herein as set forth in detail above and below.

102.    As a direct result of Defendant Durairaj's negligent acts and/or omissions, King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas.  Such damages include past and future physical pain and mental anguish, loss of earning capacity, disfigurement, physical impairment, and medical care expenses. Because Durairaj's negligent acts and/or omissions rise to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to physicians generally so that Durairaj and others similarly situated in this nation will change their methods of caring for patient like King.

103.    As a direct result of Defendant Durairaj's negligent acts and/or omissions, Latanya Walker-King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas that are available to the spouse of a person like King who has sustained personal injuries.  Such damages include past and future loss of services, household services and consortium.   Latanya Walker-King hereby pleads for each and all such past and future damages.  Latanya Walker-King seeks an award of exemplary damages inasmuch as Durairaj's negligent acts and/or omissions rise to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to physicians generally so that Durairaj and others similarly situated in this nation will change their methods of caring for patient like King.

## IX. CAUSE OF ACTION AND DAMAGES (RAMEY)

104.    By reason of the facts set forth above, Ramey was negligent, grossly negligent, and/or willfully and wantonly negligent in failing to properly carry out his medical responsibilities to

King in accordance with accepted standards of medical practice, thereby proximately causing injuries and damages to Plaintiffs.

105.     These acts and/or omissions of Ramey include, but are not limited to, the following: (1) improper care and treatment of King's complaints of severe neck and upper back pain, and neurological signs and symptoms, (2) failure to timely diagnose and treat the cause of King's signs and symptoms, to wit- a C4-5 epidural abscess; (3) failure to timely obtain the necessary diagnostics including proper physical examination and MRI of the cervical spine; (4) failure to timely obtain neurological and neurosurgical consults; (5) failure to timely admit King; *(6)* discharging King without performing proper assessments, examinations, and procedures and at a time when he was unstable; (7) failure to timely transfer King to a facility with neurosurgical services; (8) failure to timely see King; (9) failure to perform a timely and proper physical examination of King; (10) in not obtaining medical records or information from King's prior emergency department admissions; (11) failure to timely notify a physician about King's condition and need to be seen; to name a few.

106.     The acts and/or omissions of Ramey constitute health care liability, negligence, gross negligence, and/or willful or wanton negligence as those terms are utilized in Chapter 74 of the Texas Civil Practice & Remedies Code and the common and statutory law of torts.

107.     Such health care liability, negligence, gross negligence and/or willful or wanton negligence was a proximate cause of the personal injuries and damages incurred by Plaintiffs herein as set forth in detail above and below.

108.     As a direct result of Defendant Ramey's negligent acts and/or omissions, King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas.  Such damages include past and future physical pain and mental

anguish, loss of earning capacity, disfigurement, physical impairment, and medical care expenses. Because Ramey's negligent acts and/or omissions rise to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to physicians assistants generally so that Ramey and others similarly situated in this nation will change their methods of caring for patient like King.

109.     As a direct result of Defendant Ramey's negligent acts and/or omissions, Latanya Walker-King is entitled to recover and seeks recovery of those elements/types of damages available for personal injury under the law of Texas that are available to the spouse of a person like King who has sustained personal injuries.  Such damages include past and future loss of services, household services and consortium.   Latanya Walker-King hereby pleads for each and all such past and future damages.  Latanya Walker-King seeks an award of exemplary damages inasmuch as Ramey's negligent acts and/or omissions rise to and exceeds the level of gross negligence, as that term is defined in law, exemplary damages are warranted.  The fact finder should assess an award of exemplary damages that will serve both as an appropriate punishment and as a warning and deterrent to physicians assistants generally so that Ramey and others similarly situated in this nation will change their methods of caring for patient like King.

110.    Plaintiffs assert that no part of Chapter 74 (Medical Liability) of the Texas Civil Practice & Remedies Code applies to Plaintiffs' EMTALA claims against Defendant MTBH.

## X. DEMAND FOR JURY

111.    Plaintiffs hereby respectfully request a trial by jury.

## XI. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that upon a final hearing, Plaintiffs have judgment against Defendants for all damages alleged and pleaded herein, prejudgment interest as allowed by law, post-judgment interest, court costs and for such other and further relief to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

By: _____

**RYAN KREBS, M.D., J.D.**
Texas State Bar No. 00792088

**LAW OFFICE OF RYAN KREBS, M.D., J.D.**
805 W. 10th Street, Suite 300
(512) 478-2072
(512) 494-0420 Facsimile
ryan@ryankrebsmdjd.com

AND

**MICHELLE MALONEY**
Texas State Bar No. 24069099
**MARYNELL MALONEY LAW FIRM, PLLC**
115 East Travis Street, Suite 1800
San Antonio, Texas 78205
(210) 212-8000
(210) 212-8385 Facsimile
michelle@marynellmaloneylawfirm.com

**CHRIS HERNANDEZ**
Texas State Bar No. 24069098
**MARYNELL MALONEY LAW FIRM, PLLC**
115 East Travis Street, Suite 1800
San Antonio, Texas 78205
(210) 212-8000
(210) 212-8385 Facsimile
chris@marynellmaloneylawfirm.com

**ATTORNEYS FOR PLAINTIFFS**