**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| CARL KING AND | § | |
| LATANYA WALKER-KING, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. SA-16-CV-1201-XR |
| | § | |
| VHS SAN ANTONIO PARTNERS, LLC | § | |
| D/B/A MISSION TRAIL BAPTIST | § | |
| HOSPITAL; VIKRAM DURAIRAJ, MD; | § | |
| LONNY RAMEY, PA, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## ORDER

On this date, the Court considered the status of the above captioned-case. After careful consideration, the Court GRANTS Defendant Lonny Ramey's Motion for Summary Judgment (Docket no. 95), DENIES Defendant VHS San Antonio Partners, LLC d/b/a Mission Trail Baptist Hospital ("MTBH")'s Motion for Partial Summary Judgment (Docket no. 96), and DENIES MTBH's Motion for Summary Judgment on Causation (Docket no. 97). In addition, the Court DENIES various motions to exclude the testimony of a number of medical professionals (Docket nos. 98, 100, 103, 105, 107, 108, 156, 157, 160 and 161).

## BACKGROUND

### I. Factual Background

On November 25, 2016, Plaintiffs Carl King and Latanya Walker-King filed their Complaint with this Court. Docket no. 1. Plaintiffs filed their Amended Complaint on July 18,

1

2017. Docket no. 56. Plaintiffs name MTBH, Vikram Durairaj, M.D., and Lonny Ramey, P.A., as Defendants and bring negligence claims against all Defendants and a claim under the Emergency Medical Treatment and Active Labor Act ("EMTALA") against MTBH following medical treatment that Carl King received at MTBH. *Id.* at 2.

On July 16, 2015, Carl King presented at Methodist Hospital's emergency department in San Antonio, Texas, complaining of persistent right-sided neck pain and difficulty swallowing. *Id.* at 4–5. On examination, King was found to have "right lower cervical paraspinal tenderness to palpation with muscle spasm that radiated to his trapezius and rhomboid muscles (neck and upper back muscles)." *Id.* at 5. King was diagnosed with cervical radiculopathy/brachial neuritis, prescribed pain medication, was told to see his primary care physician, and sent home. *Id.*

On July 17, 2015, King presented at Northeast Methodist Hospital in San Antonio, Texas, complaining of persistent severe neck pain radiating to his right shoulder and numbness of both arms. *Id.* On examination, King was reportedly found to have "right neck tenderness to palpation but no motor or sensory deficits." *Id.* King was diagnosed with neck muscle spasms, prescribed pain and muscle spasm medication, instructed "regarding warm compress to his neck," was told to see his primary care physician, and sent home. *Id.*

On July 20, 2015, at around 8:47 a.m., San Antonio Fire Department EMS was called and transported King to MTBH, with the nature of the call described as "Stroke/CVA," and King arrived at MTBH at around 9:46 a.m. *Id.* at 6. Plaintiffs state that the MTBH emergency department's record begins with a notation stating "not employed" and "no ins[urance]." King states that triage nurse Rebecca Krett, R.N., documented, "This is patient's 3rd visit to an emergency department for same complaint of neck/upper back pain. States that now he is unable

to walk and arms feel weak and numb. Patient comes into emergency department for evaluation." *Id.* at 13. At around 10:59 a.m., nurse Bradley Marron, R.N., documented, "Muscle strength: right sided upper and lower extremity weakness. 0/5 on right lower extremity. 1/5 on right upper extremity. There is right-sided weakness." *Id.*

Plaintiffs allege that King was then placed on a bed in the hallway, where he waited for two hours until Dr. Durairaj saw him at around 11:51 a.m. *Id.* Dr. Durairaj entered notes regarding "Neck or Upper Back Injury/Pain" that included a summary of King complaining of muscular spasms, neck pain, numbness, and motor deficits to all extremities. *Id.* Plaintiffs allege the notes demonstrate that King's neck was not examined, his reflexes were not checked, and that no labs, EKG, or X-rays were performed. *Id.* at 14. King was diagnosed with muscle spasm and the notes indicate that "Emergency Medical Condition stabilized." *Id.* Plaintiffs allege that around 11:54 a.m., Dr. Durairaj ordered and King received Toradol and Norflex. *Id.* Plaintiffs allege that upon discharge, his pain was an 8 on a scale of 10, he was given a prescription for the muscle spasm diagnosis, and the discharge instructions said to, "follow up with primary care doctor this week to order MRI if he thinks symptoms warrant." *Id.* King was allegedly discharged shortly after noon. *Id.*

Plaintiffs allege that during the entirety of this visit, King had a "large ventral epidural abscess centered at cervical vertebrae 4 and 5 (C4-5 epidural abscess); i.e., a collection of pus next to and pressing on the front of the spinal cord at the level of the 4th and 5th cervical vertebrae." *Id.* Plaintiffs allege that other patients who previously presented at MTBH with similar symptoms that King showed were provided a full medical screening examination

("MSE") to analyze a possible central nervous system condition. *Id.* at 15. Plaintiffs allege that King did not receive a sufficient MSE. *Id.*

Plaintiffs allege that when King was discharged, he could not walk unassisted from the MTBH emergency department and had to be lifted into a car. *Id.* When King's daughter went back into MTBH to speak to someone, "another gentleman" allegedly told MTBH staff that King fell outside, and King was wheeled back into the emergency department. *Id.* at 19. For the second time that day, King was admitted into the MTBH emergency department at around 1:56 p.m. *Id.*

Plaintiffs allege that King requested an examination and treatment for a medical condition. *Id.* At around 2:11 p.m., P.A. Ramey allegedly began a medical screening examination by ordering testing on King for pancreatitis, for heart ischemia, a comprehensive metabolic panel, for blood clotting, a complete blood count with differential count, an ECG, and a chest x-ray. *Id.* P.A. Ramey never saw King, never examined King, and allegedly did not notify Dr. Durairaj of the need for a timely examination of King. *Id.* Ramey confirms that he ordered these tests and that he never personally saw King. Docket no. 95 at 2.

Ramey alleges these tests were part of King's initial assessment or initial labs conducted on an emergency patient, and that he did not conduct an MSE himself. *Id.* at 7–8. Ramey alleges that, although he cannot recall the actual exchange with the triage nurse, he now infers from reading the medical records that he ordered these specific tests based on a history of weakness and pain identified in King's records. *Id.* at 8. Ramey also alleges that he does not recall being told that King could not move his arms or legs, and that he does not recall a triage nurse ever giving him a "Triage Note" that stated that King could not move his arms or legs. *Id.* at 8–9.

Plaintiffs allege that at around 6:00 p.m., about four hours after King was re-admitted to MTBH, nurses performed another assessment of him. Docket no. 56 at 20. The assessment identified King's reports of pain, numbness, tingling, and a desire to have more tests done. *Id.* MTBH alleges that the nurse's assessment showed that King "was moving all extremities with symmetry of strength and without involuntary movements" and that King denied feeling touch but withdrew to pain. Docket no. 96 at 5.

Plaintiffs allege that King saw Dr. Durairaj again at 6:52 p.m., and Dr. Durairaj completed an "Emergency Physician Record – Neuro Symptoms/Deficit" form that identified King's complaint of weakness, summarized his previous complaints and symptoms, and the results of a physical exam. Docket no. 56 at 21. Dr. Durairaj ordered and reviewed a head, cervical, lumbar, and thoracic CT for King and concluded the results were "most consistent with small amount of subdural hematoma." *Id.* Plaintiffs allege that King was not given the same timely MSEs given to other patients who displayed similar symptoms. *Id.* at 24.

Plaintiffs allege that at around 9:37 p.m., MTBH providers discussed with University Hospital in San Antonio King's possible transfer for a subdural hematoma, and at around 10:18 p.m., King was transferred to University Hospital and arrived around 10:35 p.m. *Id.* at 26. At around 1:00 a.m. on July 21, 2015, Plaintiffs state that neurosurgery saw King for quadriplegia and a possible subdural hematoma. *Id.* Despite the subsequent surgery, King was left with a permanent cervical spinal cord injury that caused quadriplegia/paresis. *Id.* at 27.

Plaintiffs allege that had Defendants provided King with a proper MSE, including a timely physical and neurological exam, he would have received earlier "neurosurgical treatment to timely relieve/decompress spinal cord compression by his C4-5 epidural abscess and would

not have suffered permanent spinal cord injury causing quadriplegia." *Id.* Plaintiffs allege that King was treated below the applicable standards of care and disparately from other MTBH emergency department patients with the same or similar symptoms. *Id.* at 28. Plaintiffs allege that MTBH was aware that King was uninsured, unemployed, and had no apparent ability to pay when it failed to perform the proper MSEs. *Id.* at 29. Plaintiffs allege that MTBH violated EMTALA by failing to give King an MSE reasonably calculated to identify his critical medical condition, treating King differently from other patients with similar symptoms, failing to stabilize King's emergency medical condition, and discharging King from MTBH while he was unstable. Docket no. 56 at 29–34. Plaintiffs allege that Latanya Walker-King, the wife of Carl King, is entitled to recover damages available under Texas law based on King's injury for past and future loss of services, household services, and consortium. *Id.* at 33–34, 36, 40.

## II. Procedural History

On November 14, 2017, Plaintiffs and Defendant Dr. Durairaj advised the Court that they reached a settlement agreement to resolve all of Plaintiffs' claims against Dr. Durairaj. Docket no. 79. On February 15, 2018, Plaintiffs filed a stipulation of dismissal as to all claims against Dr. Durairaj, and Dr. Durairaj was terminated from the case. Docket no. 128.

On January 4, 2018, P.A. Ramey filed his Motion for Summary Judgment, arguing that Plaintiffs present no evidence that Ramey was grossly negligent, breached the standard of care, or proximately caused Plaintiffs' alleged damages. Docket no. 95.  On January 5, 2018, MTBH filed its Motion for Summary Judgment on Plaintiff's EMTALA claim, arguing that Plaintiffs improperly attempt to convert negligence allegations into a viable EMTALA claim. Docket no. 96. On the same date, MTBH also filed a Motion for Summary Judgment on Causation, arguing

that Plaintiffs fails to show any evidence that the alleged delay of proper care at MTBH caused King's permanent tetraplegia. Docket no. 97. On April 17, 2018, the parties attended a status conference and motions hearing before the Court to discuss the status of the case and present further arguments on the pending motions for summary judgment.

## ANALYSIS

### I.     Legal Standard

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the

moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## II.     P.A. Ramey's Motion for Summary Judgment

Ramey argues he is entitled to summary judgment on Plaintiffs' negligence claim because there is no evidence that he was grossly negligent, breached the standard of care in any way, or proximately caused Plaintiffs' damages.

Under Texas law, a plaintiff who brings a medical malpractice claim must show "(1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation." *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008) (citing *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003)). The plaintiff must establish the proper standard of care "before a factfinder may consider whether the defendant breached that standard of care to the extent it constituted negligence." *Id.* Also, "[u]nless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman, expert testimony will be required." *Id.* (quoting *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977)). The expert testimony is required to show "both a breach of a standard of care and that the breach was a proximate cause of the harm suffered." *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (citing *Chambers v. Conaway*, 883 S.W.2d 156, 158 (Tex. 1993)).

Plaintiffs bring their negligence claim against Ramey following treatment in MTBH's emergency department. Because the action involves a "health care liability claim against a physician or health care provider for injury . . . arising out of the provision of emergency medical care in a hospital emergency department," Plaintiffs must show by a preponderance of the

evidence that Ramey, "with wilful and wanton negligence," "deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances." Tex. Civ. Prac. & Rem. Code § 74.153. Under this statute, the legislature's use of "wilful and wanton negligence" has been interpreted to mean "gross negligence." *Turner v. Franklin*, 325 S.W.3d 771, 781 (Tex. App.—Dallas 2010, pet. denied); *see also Fewins v. CHS/Cmty. Health Sys., Inc.*, 158 F. Supp. 3d 579, 585 (N.D. Tex.), *aff'd sub nom. Fewins v. Granbury Hosp. Corp.*, 662 F. App'x 327 (5th Cir. 2016).

Gross negligence is comprised of two elements: one objective and one subjective. *Turner*, 325 S.W.3d at 781. A plaintiff must show that "when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others," and "the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012) (citing Tex. Civ. Prac. & Rem. Code § 41.001). In essence, Plaintiffs must show that Ramey's treatment of King "posed an extreme degree of risk" and that he had "actual, subjective awareness" that the treatment he provided was inadequate to properly examine King, but nevertheless proceeded with the treatment actions that he did. *See id.*

Under the objective prong, "extreme risk" does not mean a remote possibility or even a high probability of a minor harm, "but rather the likelihood of the plaintiff's serious injury." *Id.* Ramey argues that Plaintiffs present no evidence that Ramey ordering King to undergo certain tests involved an extreme risk. Plaintiffs argue that the symptoms that King complained of, that were then relayed to Ramey, were indicative of dire health risks that required Ramey to conduct

a more thorough physical examination of King beyond the tests that he ordered. Plaintiffs primarily turn to expert opinion to support their argument that, when viewed objectively from Ramey's standpoint, his failure to conduct a more thorough medical examination involved an extreme degree of risk. Plaintiffs argue that based on Dr. William W. Spangler's expert opinion, it was objectively foreseeable to an ordinarily prudent physician assistant under similar circumstances "that an intentional failure to perform a focused physical examination addressing known 'cardiogenic' or 'neurogenic' symptoms indicative of potentially severe health implications might reasonably result in a neurologic injury, such as that ultimately suffered by King." Docket no. 118-5 at 8. Although Plaintiffs do little to demonstrate how Dr. Spangler's opinion or the facts of the case reach the level of "extreme risk" demanded by the objective prong of gross negligence, the Court finds there is at least a genuine dispute of material fact as to whether the tests that Ramey ordered and any additional care he did not provide involved an extreme degree of risk with respect to King's likelihood of serious injury.

Under the subjective prong, Plaintiffs must show that Ramey knew about the risk that King would suffer permanent spinal cord injury causing quadriplegia, but that his acts or omissions showed indifference to the consequences of those acts. *Waldrip*, 380 S.W. at 138. "In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Turner*, 325 S.W.3d at 782 (quoting *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981)). Ramey argues that there is no evidence to even suggest that Ramey was aware of an extreme risk of spinal injury to King, nor any proof that Ramey's actions demonstrated that he didn't care. Plaintiffs argue that the tests Ramey ordered and his deposition testimony are evidence of the subjective prong of gross negligence.

Plaintiffs argue that the tests that Ramey ordered for King to undergo are "unquestionably indicative of his belief that Mr. King might be suffering from acute coronary disease, or neurologic disease, which are life threatening by their very nature." Plaintiffs also argue that Ramey "testified that the most likely reason that he ordered the above-listed tests was that the triage nurse informed him that King's chief complaints were pain and weakness, which Ramey interpreted to be of 'cardiogenic' or 'neurogenic' origin." Docket no. 118 at 27. Plaintiffs then argue that "despite the fact that the diagnostic tests ordered by Ramey demonstrate his awareness of the life-threatening implications of Mr. King's reported symptoms," "Ramey allowed King to sit unmonitored in the waiting area for nearly five hours, without being seen by a physician and without any therapeutic intervention for the very 'cardiogenic' or 'neurogenic' illness Ramey suspected King of suffering from, all of which represents conscious indifference to King's rights, safety and welfare." *Id.*

Plaintiffs, however, mischaracterize the subjective awareness that Ramey describes in his deposition testimony. In his deposition, Ramey was asked and answered the following about the triage notes he received and his response:

> Q. So here's what I'm trying to understand, is: If [King] didn't complain of chest pain, and, yet, you ordered tests for a patient with chest pain, and you didn't see [King], one way to interpret that is [the triage nurse] Audrey Coles gave you information such as "[King's] having chest pain" that led you to order those tests. Would you agree that is one explanation for what happened?
>
> . . .
>
> A. The -- to me, what the most likely scenario, after reading her triage sheet -- or the triage sheet that was filled out, is that she mentioned "weakness" to me or "pain"; but -- and those types of chief complaints in an ESI 3 patient commonly get chest pain orders because you don't know if it's cardiogenic, neurogenic, if it's -- I mean, there's – there's several things that can cause weakness and pain.

Docket no. 118-4 at 46. Ramey never stated, as Plaintiffs allege, that he *interpreted* the reported symptoms of "weakness" and "pain" to be of "cardiogenic" or "neurogenic" origin." Ramey clearly states that "you don't know" if it's cardiogenic, neurogenic, or something else, because "there's several things that can cause weakness and pain." Ramey only states in his deposition that his subjective awareness at the time was that the most likely scenario was that he received a report of weakness and pain, and that the chest pain test that Ramey ordered is common for ESI 3 patients. Although Plaintiffs provide expert testimony that it was grossly negligent for Ramey to not follow through with a more thorough medical exam of King, these opinions are based on the same mischaracterization of Ramey's testimony, such as Dr. Spangler's opinion that begins with, "[g]iven Ramey's own testimony regarding the admitted likelihood that Ramey had ordered tests to determine whether the pain complained of by King was 'cardiogenic' or 'neurogenic' in nature . . . ." Docket no. 118 at 28. Ramey never admitted that he likely ordered the tests that he did to determine if the pain was specifically cardiogenic or neurogenic. He stated that there are several things that can cause weakness and pain, including cardiogenic or neurogenic conditions, but that someone in his position doesn't know before ordering a chest pain test. Neither with this line of argument, nor with any other evidence, do Plaintiffs meet their burden of presenting evidence that Ramey "knew about the peril" that King faced with a risk of permanent spinal cord injury. Instead, Plaintiffs present evidence that Ramey was subjectively aware that King reported weakness and pain and ordered certain tests that he alleges are common for patients like King.

"Evidence of 'some care' will not disprove gross negligence as a matter of law" and courts must look for evidence of a defendant's mental state. *Turner*, 325 S.W.3d at 784. Here,

however, Plaintiffs do not raise a fact issue on the subjective prong of gross negligence. Although Plaintiffs may raise a fact issue as to Ramey's possible negligence, the quoted deposition testimony from Ramey does not demonstrate that he was subjectively aware of an extreme risk or acted with conscious indifference to the rights, safety, or welfare of King. *See Miller v. Mullen*, 531 S.W.3d 771, 780 (Tex. App.—Texarkana 2016, no pet.) (finding no fact question on subjective prong of gross negligence even thought there was fact question as to objective prong where doctor responded to patient's observed symptoms with standard medication protocol); *Burleson v. Lawson*, 487 S.W.3d 312, 324 (Tex. App.—Eastland 2016, no pet.) (finding no fact issue on subjective prong of gross negligence where plaintiffs alleged doctor failed to conduct additional tests and released patient too early because patients presented insufficient evidence as to doctor's subjective mental state).

Plaintiffs fail to present evidence to meet the subjective prong of gross negligence against Ramey. Accordingly, the Court finds that there is no genuine dispute of material fact that Ramey did not act with gross negligence in his treatment of King at MTBH. The Court need not analyze the parties' arguments on proximate cause.

### III. MTBH's Motion for Summary Judgment on Causation

MTBH argues it is entitled to summary judgment on Plaintiffs' negligence claim because there is no evidence that the alleged delay of proper care at MTBH caused King's permanent spinal cord injury.

As discussed above, a plaintiff who brings a medical malpractice claim must show "(1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation." *Hannah*, 523 F.3d 597 at 601. Further, expert

testimony is required to show "both a breach of a standard of care and that the breach was a proximate cause of the harm suffered." *Guile*, 422 F.3d at 225. "[T]he ultimate standard of proof on the causation issue is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993).

MTBH argues that Plaintiffs fail to raise a fact issue as to whether the alleged delay at MTBH was sufficient to cause King's permanent tetraplegia. MTBH argues that according to its expert Dr. Rabih Darouiche, "as long as the surgery to decompress the epidural abscess is performed within 24 to 36 hours after the onset of neurological symptoms, the surgery is timely," and Plaintiffs provide no expert testimony to establish "the last time a decomposition surgery could have been performed in order for there to be a good outcome." Docket no. 97 at 2, 8. MTBH's experts opine that there are four stages of spinal epidural abscess, and based on the records of King's first visit to MTBH that indicate he had feeling in his arms, "walked in" to the emergency department, and could move all four limbs, King "could not have progressed to Stage 4 until after [King] presented to [MTBH] on the second ED visit." *Id.* at 10.

MTBH's experts further opine that patients who have progressed to Stage 4 of a spinal epidural abscess and who have been paralyzed, but "undergo decompressive laminectomy within 24 to 36 hours of paralysis," "are likely to regain some neurologic function postoperatively, thereby switching to stage 3." *Id.* MTBH argues that King underwent surgery within 12 hours of progressing to Stage 4, given that he did not progress to Stage 4 until after his first MTBH visit ended shortly after noon, he was readmitted at 1:56 p.m., and underwent surgery for the epidural

abscess by 2:00 a.m. *Id.* Based on this expert analysis, MTBH argues that the alleged "delay" in King's epidural abscess diagnosis "was not so significant as to delay surgery and thereby result in Mr. King having permanent tetraplegia," and Plaintiffs fail to meet their burden of how the alleged twelve-hour period of time proximately caused King's permanent tetraplegia. *Id.* at 10–11.

Plaintiffs argue that they have presented evidence that MTBH failed to promptly treat and diagnose King during his two visits at MTBH, and the resulting delay led to the closing of a "window of opportunity" during which King's epidural abscess could have been more timely treated to prevent or ameliorate his permanent quadriplegia. Docket no. 122 at 6. Plaintiffs argue that time is always of the essence when treating an epidural abscess and that their expert's opinion creates a fact issue as to whether the alleged delay in diagnosing and treating the abscess proximately caused King's permanent tetraplegia. *Id.* at 6–7. Plaintiffs argue that MTBH relies almost exclusively on Dr. Darouiche's unsupported expert opinion that Stage 4 spinal epidural abscess patients have a 24 to 36 hour window to undergo surgical decompression, and that Dr. Darouiche is trained only in internal medicine and infectious diseases, which are not a neurological specialty. *Id.* at 18. Plaintiffs argue that their expert Dr. Sanjay Dhall rejects the idea that it is proper for a health care provider to intentionally leave a Stage 3 or 4 spinal epidural abscess untreated for an extended period of time because of the risk of permanent paralysis. *Id.*

Even if the Court takes Dr. Darouiche's theory about a 24 to 36 hour window between the time of paralysis and the time of surgery as valid, Plaintiffs still raise a question of fact as to proximate cause. Plaintiffs' expert Dr. Dhall, a practicing neurosurgeon with experience treating spinal infections, including spinal epidural abscesses, disagreed with Dr. Darouiche's

assessment. *Id.* at 20. Dr. Dhall opined that if patients suffer from "rapidly progressive loss of motor and sensory and gait and bowel and bladder and respiratory function, such as Mr. King did, they require emergent surgical decompression." *Id.* Dr. Dhall opined that "damage due to the mass effect of the abscess . . . results in an irreversible injury and/or stroke of the spinal cord, as occurred with Mr. King," which calls for decompressive surgery to be performed as soon as possible on patients suffering from a spinal epidural abscess. *Id.* Dr. Dhall opined that "because a direct correlation exists between the speed of diagnosis and treatment and successful outcomes for patients such as Mr. King, the twelve hour delay caused by MTBH's failure to properly diagnose and treat Mr. King's spinal epidural abscess proximately caused Mr. King's permanent spinal cord injury and quadriplegia." *Id.* Dr. Dhall stated that if King was properly and promptly examined during his two MTBH visits, his abscess would have been timely diagnosed and subsequent treatment would have resulted in a "much better neurological outcome" for him. *Id.*

MTBH argues that Dr. Dhall fails to make any statement "regarding the last time at which the surgery could have been performed in order to avoid permanent quadriplegia." Docket no. 123 at 2. Because Dr. Dhall does not opine on when the "window of opportunity" closed for a surgery to be performed to prevent the permanent tetraplegia, MTBH argues, Plaintiffs cannot prove that MTBH's alleged delay more than doubled King's risk of injury. But at this stage, the Court finds that Dr. Dhall does not have to provide additional detail on the "last available time that the surgery could have been performed" for Plaintiffs to present an issue of fact on causation. Dr. Dhall disagrees with Dr. Darouiche's assessment of King's diagnosis, treatment, and outcome by opining that if King had been more thoroughly examined sooner than he was, his abscess would have been diagnosed sooner, he would have undergone treatment with IV

antibiotics and a more immediate surgical intervention, and would have ended up with a better neurological outcome.

Plaintiffs and MTBH have provided conflicting expert testimony on the question of causation. MTBH has provided an expert who opines that because the epidural abscess was operated on within a 24 to 36 hour window, any alleged delay on MTBH's part could not have caused King's permanent tetraplegia. Plaintiffs, on the other hand, have provided sufficient evidence to meet its burden and create an issue of fact with their expert disagreeing with MTBH's expert, stating that time was of the essence, and opining that MTBH's delay foreclosed King from a better neurological outcome and caused his permanent tetraplegia. This is a question for the jury. *See Dossey v. Becton Dickinson & Co.*, No. 7-01-CV-026-R, 2001 WL 1636440, at *3 (N.D. Tex. Dec. 18, 2001); *see also Mathis v. Bocell*, 982 S.W.2d 52, 61 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding that where movant's expert testimony is controverted by opposing expert testimony, a genuine issue of material fact is created and summary judgment should be denied). Accordingly, MTBH's motion for summary judgment on causation is denied.

### IV.    MTBH's Motion for Summary Judgment on Plaintiffs' EMTALA Claims

MTBH argues it is entitled to summary judgment on Plaintiffs' EMTALA claims regarding medical screening, stabilization, and transfer requirements. EMTALA is an anti-patient dumping statute enacted to prevent hospitals from refusing to treat a patient because of one's non-insured status or inability to pay. *Fewins v. CHS/Community Health Sys.*, 158 F. Supp. 3d 579, 582-583 (N.D. Tex. 2016), *aff'd*, 662 F. App'x 327 (5th Cir. 2016) (citing *Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998). Under EMTALA, a hospital must provide any person who presents to the emergency room "an appropriate medical screening

examination . . . to determine whether or not an emergency medical condition exists." *Id.* (citing 42 U.S.C. § 1395dd(a)). An emergency medical condition is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." *Id.* (citing § 1395dd(e)(1)). If the hospital determines that such a condition exists, the hospital must either stabilize the person's condition, or, under certain circumstances, transfer the individual to another medical facility. *Id.* (citing to § 1395dd(b)). Plaintiffs have alleged that MTBH failed to provide King with an appropriate medical screening examination, and that it failed to stabilize King's condition.

Although EMTALA does not define what constitutes an "appropriate screening examination," the Fifth Circuit has held that such an examination is "a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." *Guzman v. Mem'l Hermann Hosp. Sys.*, 409 F. App'x 769, 773 (5th Cir. 2011). An "inappropriate screening examination is one that has a disparate impact on the plaintiff." *Id.* (citing *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir.1996)). A plaintiff can prove disparate impact "by showing that the hospital did not follow its own standard screening procedures or by pointing to differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital." *Id.* A patient can also prove that an EMTALA violation occurred by showing "that the hospital provided such a cursory screening that it amounted to no screening at all." *Id.*

MTBH argues that there is no question that King was provided with an appropriate MSE. MTBH states that King underwent a triage assessment and had vital signs measured during both MTBH visits and that Dr. Durairaj provided an MSE and focused physical examination during each of these visits. MTBH argues that during the first visit, Dr. Durairaj believed that King was suffering from muscle spasms, and on the second visit, Dr. Durairaj was made aware of King's earlier fall and ordered a trauma CT panel to determine if there was an emergency medical condition or not. MTBH argues that Plaintiffs fail to show that an emergency medical condition was within the actual knowledge of Dr. Durairaj.

Plaintiffs argue that they have presented evidence that King did not receive an appropriate MSE. Plaintiffs allege that MTBH failed to follow its own EMTALA policies related to screening procedures, which state that incoming patients will be provided a "focused physical exam," which is an "exam appropriate to the organ system related to the chief complaint . . . [f]or example, [p]atients that complain of earaches need to have an ear exam; [p]atients that complain of sore throats need throat examined." Docket no. 125-8 at 7. In his deposition, Dr. Durairaj confirmed that, under MTBH's policy, patients who complain of an earache need an ear exam, patients who complain of a sore throat need a throat exam, and patients who complain of neck and back pain need a neck and back exam. Docket no. 125-15 at 101. Plaintiffs point out that during King's first MTBH visit, he complained of pain in his neck and back, but after Dr. Durairaj saw King at around 11:51 a.m., on the form where Dr. Durairaj's exam notes are recorded, the "back" section is marked "non-tender," but the "neck" section is left blank. Docket no. 125-5. Plaintiffs argue that this shows Dr. Durairaj did not conduct an appropriate neck exam, despite the fact that King complained of neck pain. In his deposition, Dr. Durairaj

confirmed that "there's nothing indicating any exam of the neck." Docket no. 125-15 at 166–67. Dr. Durairaj does explain that, although nothing is checked in the "neck" section, that this "doesn't mean that an exam wasn't done" and for King's neck, "it just wasn't – documented, but [Dr. Durairaj] palpated his spine, and everything was non-tender." *Id.* Dr. Durairaj stated that he doesn't know if his scribe, who was recording notes from the exam, "checked non-tender under back assuming it was – the neck is included." *Id.*

Although Dr. Durairaj stated in his deposition that he palpated King's spine and found that it was non-tender, the exam form does not indicate this fact. Further, as Plaintiffs point out, MTBH does not identify any corroborating evidence. Plaintiffs dispute Dr. Durairaj's claim and allege that King did not receive an appropriate neck exam. Also, Plaintiffs allege that the failure to document the purported examination of King's neck further violates MTBH's EMTALA policies, which state in part that "[t]he results of the MSE will be recorded on the appropriate ED documentation sheet and become part of the Patient's permanent medical record." Docket no. 125-8 at 7. At the very least, the Court finds that there is a factual dispute between Dr. Durairaj's testimony and Plaintiffs' arguments about the medical records and what exams King was actually given.

MTBH argues that EMTALA is not a federal malpractice statute, but rather, that it serves as a gap-filler to provide a remedy for a facility's "failure to treat." *See Tenet Hosps. Ltd. v. Boada*, 304 S.W.3d 528, 533 (Tex. App. 2009). Thus, MTBH argues, an EMTALA violation should not be judged against a negligence standard. But at the very least, Plaintiff has raised an issue of fact as to whether King received an appropriate MSE by alleging that MTBH did not

follow its own standard screening procedures under EMTALA. Accordingly, MTBH is not entitled to summary judgment on Plaintiffs' claim that it violated EMTALA.

## MOTIONS TO EXCLUDE VARIOUS MEDICAL PROFESSIONALS

The parties in this case have engaged in a tit-for-tat exchange of seeking to disqualify anyone whose opinions they disagree with. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). The Court accordingly DENIES the various motions to exclude the testimony of a number of medical professionals (Docket nos. 98, 100, 103, 105, 107, 108, 156, 157, 160 and 161).

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendant Lonny Ramey's Motion for Summary Judgment (Docket no. 95). Plaintiff's claims against Defendant Ramey are hereby DISMISSED WITH PREJUDICE. Ramey's motion to join other motions filed by MTBH is dismissed (Docket no. 159). Plaintiff's motion to strike (Docket no. 102) is dismissed inasmuch as it was replaced with Plaintiff's amended motion to strike (Docket no. 161).

The Court further DENIES Defendant VHS San Antonio Partners, LLC d/b/a Mission Trail Baptist Hospital ("MTBH")'s Motion for Partial Summary Judgment (Docket no. 96) and DENIES MTBH's Motion for Summary Judgment on Causation (Docket no. 97).

The Court DENIES the various motions to exclude the testimony of a number of medical professionals (Docket nos. 98, 100, 103, 105, 107, 108, 156, 157, 160 and 161).

It is so ORDERED.

SIGNED this 9th day of May, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE